UNTIED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNTIED STATES

    v.                                                                        3:11CR183(JCH)

CHRISTOPHER ALLEN                               October 29, 2012

### SUPPELMETAL SENTENCING MEMORANDUM

Defendant Christopher Allen, through counsel, in anticipation of the continued sentencing hearing currently scheduled for November 2, 2012, submits this Supplemental Sentencing Memorandum.

<u>Preliminary Statement</u>

As more fully set forth in Mr. Allen's June 25, 2012 Sentencing Memorandum and Motion for Downward Departure, it respectfully is submitted that a serious injustice is being perpetuated by this prosecution.  Before the Government arrested its eventual CI in this case, "Mike," who immediately agreed to cooperate proactively with DEA, Chris Allen had never been involved in the distribution of Oxycodone.  The Government created this crime to prosecute it.  If "Mike" had never been arrested in April 2011, or if "Mike" had not agreed to cooperate proactively with DEA to set-up Chris Allen and others, Mr. Allen would no doubt would never had been charged with a crime and would be still be working as a TSA in the West Palm Beach airport.

<u>The Parties Plea Agreement</u>

Because "Mike" was working with and for DEA the entire time he

sought-out and recruited Chris Allen to his criminal enterprise, all of the "drugs" in question at the time Chris Allen became involved were, in fact, fake drugs. On each and every trip through the West Palm Beach airport, "Mike" was carrying baby aspirin.  It is for this reason that the parties' plea agreement is quite different from most plea agreements filed with the Court in drug cases.

In short, because the "drugs" in question at the time Chris Allen was involved with "Mike" all were fake drugs, Mr. Allen and his counsel would not agree with the Government that any "real" drugs were involved in the offense of conviction.  The effect of this unusual agreement, or lack thereof, is, of course, to place the burden of proof on the Government to establish the appropriate sentencing range to the satisfaction of the Court.

## The Government's Evidence

Apparently the Government plans to attempt to meet its burden of proof at the continued sentencing by relying on two forms of evidence:  (1) an excerpt of a transcript of a recording between "Mike" and Chris Allen; and (2) a demonstration to the Court at the hearing of what the bottles of baby aspirin would have looked like when they went through security.

Just before the last sentencing hearing, the Government filed a Sentencing Memorandum.  In its Memorandum, the Government set forth its "representations" of the contents of various recordings it gathered during the course of its investigation.  The only such excerpt relevant to the quantity issue before the Court is from a recording that occurred when "Mike" met with Chris Allen in a restaurant on June 13, 2011 (over 2 months after "Mike" had been arrested and begun cooperating with DEA).

In the Government's "representation" of the contents of this recording, it reads as if "Mike" told Chris Allen that he may have 15,000 pills in the airport the next day, but at least "5 or 6 thousand. You can't tell."  Government's Sentencing Memorandum, page 6.

After the last hearing, counsel for Mr. Allen had this excerpt transcribed by a certified court reporter. This transcript has been provided to the Court and to counsel for the Government. A review of this transcript reveals a serious discrepancy between the actual content of this recording and the Government's "representation." For example, the certified transcript makes clear that the reference to 15, 000 is not even related to the West Palm Beach airport, but to a "load" travelling on the highway near Gainesville, Florida.

Further, to the extent the Government intends to rely on an in-court demonstration of the nature of these bottles of pills and to thereafter argue that Chris Allen should have figured-out what was in them, it is disturbing that the Government's version of this transcript completely omits "Mike's" comments to Chris Allen that he packages his "drugs" in such a way that no one can tell what he is carrying:

> The way I have it situated, you can't tell, like, they're in sealed bottles, they're labeled or unlabeled bottles and, you know, it's not all sitting the corner of a fucking corner of the bag, and, you know what I'm saying ?

Transcript of June 13, 2011 meeting, pages 3-4.

In addition, to the extent the Government intends to argue that Chris Allen should have figured both the quantity **and the dosage** of the fake drugs "Mike" was carrying, it is inconsistent with the terms of the Plea Agreement. The Government now argues that Chris Allen should be sentenced on the basis of 13,000 40mg. pills. Sentencing Memorandum, page 11. In the Plea Agreement the Government prepared, however, the Government sought an agreement to two different dosages of pills - -5,000 30 mg. and 8,000 40 mg.  April 16 Plea Agreement, page 4.

The bottom line is that there is no evidence that "Mike" and Chris Allen ever discussed anything to do with the dosages of "drugs" he would be carrying through the airport. Given that Oxycodone regularly is available in dosages as low as 5 mg. it is unclear how the Government

intends to meet its burden in this regard.  It certainly appears that the quantity/dosage calculations set forth by the Government in the Plea Agreement and later in its Sentencing Memorandum consist of speculative approximations at best.

## Oxycodone Sentencing Guidelines

The Sentencing Guidelines for Oxycodone cases are draconian and unjustifiably harsh.  Before the Court is a man with no criminal record facing sentencing because a DEA cooperator came through the West Palm Beach airport on four occasions with fake Oxycodone.  Were the Court to accept the Guideline range urged by the Government, Chris Allen would be facing a term of imprisonment of 108-135 months, even after reductions for Acceptance of Responsibility and the Safety Valve. Presence Report, ¶70.  That range is equal to or higher than many career criminals that come before the Court for sentencing.

In another Oxycodone case currently pending before the Court (*United States v. Marchitto, et. als.,3:11CR69(SRU)*), Judge Underhill has repeatedly and on the record stated at sentencing hearings that, in his view, the Guidelines ranges for Oxycodone cases are unjustifiably severe.  To address this unfairness, Judge Underhill has been recalculating defendants' sentencing ranges using the Guidelines for heroin instead of Oxycodone.  It is from this new range that Judge Underhill considers any requests for departures or non-guidelines sentences.

Were the Court to adopt that approach in Chris Allen's case, the change in his sentencing range would be dramatic.  If the Court were to find that the Government had somehow met its burden and established a specific quantity and dosage of Oxycodone, the total would be 520 grams of Oxycodone. Presentence Report, ¶33.  Using the Guideline for heroin instead of Oxycodone, Chris Allen's initial sentencing range falls from level 34 to level 28.  U.S.S.G. §2D1.1.  When an abuse of trust enhancement is added, and acceptance of responsibility and safety valve reductions are subtracted, the ultimate Offense Level is 25 and the

sentencing range is 57-71 months.

It respectfully is submitted that this sentencing range is a more reasonable one from which the Court should consider Chris Allen's other requests for a downward departure or non-guidelines sentence. He is not a career criminal. He should not be facing 10 years of imprisonment because the Sentencing Commission determined that Oxycodone, a readily-available prescription drug, for some reason should be treated significantly more harshly than heroin or even crack.

## Conclusion

Chris Allen, through counsel, will not repeat here the arguments set forth in his original Sentencing Memorandum and Motion for Downward Departure - - no drugs in offense conduct, role reduction, entrapment, and aberrant behavior. Counsel does note, however, as the Court is aware, that since he was permitted to return to Florida on conditions of release, Chris Allen is again working full time. He currently is making arrangements with his former wife to once again make support payments for their son (he was current on all support payments before his arrest in this case). These factors certainly bear on his request for a downward departure of the basis of aberrant behavior. Chris Allen is making every effort to restore himself and his family to where they all were before this nightmare ever began.

Respectfully submitted,

/s/ *Peter W. Hull*

Peter W. Hull (CT 17230)

Law Office of Peter W. Hull, LLC
532 Hopmeadow Street
Simsbury, CT 06070
(860) 997-7392

Certificate of Service

    I certify that on October 29, 2012, the forgoing Supplemental Sentencing Memorandum was supplied to counsel of record *via* the Court's electronic filing system.

<u>/s/ *Peter W. Hull*</u>

Peter W. Hull (17230)